YALE DEVELOPMENT COMPANY, Plaintiff-Appellee, *v.* JOHN F. ANDERMANN *et al.*, Defendants-Appellants.

Second District (2nd Division)    No. 74-105

Opinion filed March 29, 1976.

James McClure, of Elmhurst, for appellants.

Rathje, Woodward, Dyer & Burt, of Wheaton, for appellee.

Mr. JUSTICE DIXON delivered the opinion of the court:

The plaintiff, Yale Development Company, an Illinois corporation, filed a complaint for specific performance of a real estate exchange contract and for damages against John F. Andermann and Marie J. Andermann, his wife. By amendment, Yale joined the Melrose Park National Bank as trustee under trust no. 547, grantee in a deed executed by the Andermanns shortly before the filing of the original complaint. The three defendants filed an answer and an affirmative defense in which they asked the court to declare that a rescission of the contract had taken place. The Circuit Court of Du Page County, Illinois, found for the plaintiff, entered a decree for specific performance, and reserved the question of damages for a future hearing. The defendants have appealed.

It appears that on March 24, 1964, the Andermanns gave Yale a one-year option to purchase a 70-acre tract of farmland they owned in Du Page County for a price of $175,000. The option agreement provided that if Yale exercised the option, it was to enter into an exchange contract with the Andermanns, if satisfactory farmland could be found for the exchange. The other land was to be appraised, and if valued at less than $175,000, Yale was to pay the Andermanns the difference. An unexecuted form of exchange contract was attached to the option agreement. Yale obtained two extensions of time from the Andermanns, and then on September 23, 1965, exercised its option and paid the $5,000 earnest money which the option agreement required.

At the time of Yale's exercise of its option, no property had been locat-

ed which was to be the exchange property. The Andermanns found property with which they were satisfied in early Spring of 1966. This was a 110-acre tract of farmland in Will County belonging to Eugene Weisbrook and Audrey Weisbrook, his wife. On May 11, 1966, Yale and the Andermanns executed the exchange contract for which the option agreement called. In the exchange contract the Andermanns agreed to convey their farm property to Yale in exchange for the Weisbrook property and $58,000 in cash. The final payment of $53,000 was due from Yale by July 1, 1968, and 5% interest was to be paid on July 1, 1967, and July 1, 1968.

A contract between Yale and the Weisbrooks was executed on May 13, 1966. The price for the Weisbrook farmland was $117,000. Of this amount, $10,000 was payable by Yale upon the execution of the contract, $10,000 was payable when title was shown to be good, $13,930 plus 5% interest was to be paid on December 1, 1966, $16,070 plus interest was to be paid on January 15, 1967, and the final payment of $67,000 plus interest was due on July 1, 1967. The Weisbrooks were to deliver possession of the premises on December 1, 1966. Notices to Yale were to be sent to the office of the Andermanns' attorney. A grace period of 60 days was allowed for Yale to cure any default.

Yale paid the Weisbrooks their initial $10,000, and also paid them the second $10,000 which was due when title was found to be good. Yale failed, however, to make the payment due December 1, 1966. On December 14, 1966, the Weisbrooks' attorney sent Yale a notice of default, mailing it to the Andermanns' attorney, and he informed Yale. On January 31, 1967, a declaration of forfeiture was sent to the Andermanns' attorney, who notified Yale, and a copy was sent also to Yale's attorney.

Yale then entered into negotiations with the Weisbrooks and their attorney in an attempt to salvage its contract for purchase of the Weisbrook farm, and as a result an amendment of the contract was executed on February 8, 1967. This amendment eliminated the 60-day grace period, and postponed the January 1, 1967, payment date to March 31, 1967. Yale was required to pay the amount which had been due from it on December 1, 1966, with interest, and also to pay the Weisbrooks $500 as reimbursement for additional income taxes they would have to pay for 1967 by reason of late receipt of the 1966 payment.

Yale made timely payment of the amount due the Weisbrooks on March 31, 1967, but failed to make the final payment by July 1, 1967. Thereafter, on July 3, 1967, Yale sent the Weisbrooks' attorney a proposal for a second amendment of the contract, providing for another extension of the time for payments. This proposal for a second amendment was accepted by letter dated July 20, 1967. It called for an immediate payment of $8,500 plus interest, a further payment of $10,000 plus interest on

November 1, 1967, and a final payment of $48,500 on January 15, 1968. The payment of $8,500 and interest due immediately was made by Yale on August 4, 1967.

In order to make the payment due the Weisbrooks on November 1, 1967, Yale found it necessary to borrow $10,000 from the Andermanns. As security, the Andermanns required Yale to give them a promissory note for $10,255, payable with 6% interest on January 10, 1968, and in it, an assignment of Yale's rights under the Weisbrook contract. The note provided that the secured parties could sell or otherwise dispose of the collateral on five days' written notice, in the event of default, or could propose to retain the collateral as provided in the Uniform Commercial Code. The note also authorized judgment by confession. Yale did not pay off the note to the Andermanns on January 10, 1968, when it came due, but it was not thereafter reduced to judgment, and, according to the testimony given by Mr. Andermann and by the Andermanns' attorney at the trial, notice was not thereafter given of any intended sale or other disposition of the collateral or of any proposal to retain the collateral.

On January 11, 1968, the Andermanns' attorney sent a letter to the Weisbrooks' attorney, enclosing a check for the final payment which was to be due from Yale on January 15, 1968, under the second amendment of Yale's contract with the Weisbrooks. Instructions contained in the letter were to deliver the check to the Weisbrooks and to obtain and send back a deed running from them to the Andermanns in accordance with Yale's assignment, unless by January 15, 1968, Yale paid the Weisbrooks what it owed them under its contract with them, and also paid the Andermanns the amount due on the promissory note. On January 12, 1968, the Andermanns' attorney sent Yale a letter telling what he had done, explaining that the Andermanns had asked him "to protect their interest in the Weisbrook farm," and stating that if Yale did not pay the two amounts due by January 15, 1968, a deed would be got and all documents recorded "to allow the transaction to proceed to its ultimate conclusion."

Yale did not make the payments which it was to make by January 15, 1968. The Andermanns' attorney then prepared a quitclaim deed and a corporate resolution and requested that they be executed by Yale in order to clear an objection to title. They were executed and sent back on February 14, 1968. Thereafter, on February 28, 1968, the warranty deeds from the Weisbrooks to the Andermanns were recorded. The Andermanns' attorney testified that neither Yale nor its attorney ever made any objection to cooperating with him.

On February 23, 1968, Yale sent the Andermanns a check for $40,000 and a letter apologizing for the delay, acknowledging that this was not the full amount due, and promising an attempt to make further payments in

the very near future. On March 5, 1968, the check was returned, with a letter saying that Yale's terms and conditions were unacceptable.

On March 22, 1968, Yale was sent another letter, requiring Yale to pay the Andermanns a total of $108,397.33 within 30 days. This sum was shown as including principal and interest paid on the Weisbrook contract, principal and interest due on the note, expenses incurred in getting a loan to allow completion of the Weisbrook purchase, attorneys' fees for additional services required, and damages resulting from Yale's delays, including loss of time, inconvenience, and additional 1968 income tax liability. On April 11, 1968, Yale's attorney wrote for a breakdown of the damages item, for which the figure $44,633 had been given. On April 13, 1968, the Andermanns' attorney responded that this figure was reached by determining the profit that the Andermanns would have to report if the disposition of their farm were treated as a cash sale instead of an exchange as originally intended.

On May 17, 1968, a declaration of forfeiture was sent to Yale. With it was sent a check for $58,500, represented to be all the money Yale had paid under the Weisbrook contract. On May 22, 1968, this check was sent back by Yale's attorney, with a letter stating that litigation pending in Du Page County involving the Andermann farm had been "one of the reasons for the difficulties encountered in the closing of this transaction."

In the letter he wrote on May 22, 1968, Yale's attorney proposed that a deed from the Andermanns conveying their farm to Yale be executed and placed in escrow, to be delivered when title was clear, and he agreed that Yale would pay all the amounts earlier demanded except the $44,633 for 1968 income tax liability, and would deposit $23,000 in another escrow to cover the possible tax liability, income averaging having not originally been considered in working out the larger figure. On July 18, 1968, Yale's attorney sent another letter requesting that arrangements be made for an escrow and a closing. On November 29, 1968, after instituting this suit for specific performance, Yale's attorney tendered a check for $119,301.56 to the defendants in open court, pursuant to notice, but the check was not accepted. On January 9, 1973, he again tendered a check for that amount in court and it was not accepted.

The litigation involving the Andermann farm, mentioned in Yale's letter of May 22, 1968, had been initiated to eliminate the apparent interest of a contract purchaser which had been raised as an objection in a report on title. Yale had offered to pay the expenses of a lawsuit to remove the cloud on title, and the Andermanns had consented to be named as plaintiffs. Yale itself was not a party. The litigation ultimately led to the rendering of a decision by this court, in *La Salle National Bank v. International Limited*, 129 Ill. App. 2d 381 (1970), which removed the cloud on title.

The Andermanns meanwhile had taken possession of the Weisbrook farmland, after obtaining the quitclaim deed from Yale and the warranty deed from the Weisbrooks; had caused it to be surveyed and platted as "Andermann Acres"; and, by the time of the hearing before the trial court in the case now before us, had sold a substantial number of the lots platted.

In appealing from the trial court's decision granting specific performance, the defendants argue, first, that the trial court should not have found from the evidence that Yale and the Andermanns were engaged in a joint venture, a relationship fiduciary in nature; second, that Yale defaulted under its exchange contract when it failed to pay off its note to the Andermanns on January 10, 1968, and failed to make the final payment to obtain the Weisbrook property on January 15, 1968, and so was not entitled to specific performance of the exchange contract; third, that the exchange contract was properly rescinded by the Andermanns, because Yale was in default, Yale was sent the money it had paid the Weisbrooks, and thereby Yale was placed in the same position as before the exchange contract was made; fourth, that under the terms of the assignment in Yale's note, the Andermanns sufficiently indicated a proposal to retain the collateral in their letter to Yale dated January 12, 1968, and Yale did not make timely objection but instead sent the Andermanns a quitclaim deed, so the Andermanns validly acquired the Weisbrook property and became entitled to keep it; fifth, that Yale was responsible for the lawsuit which was a cloud on the Andermanns' title, because its president had participated in the negotiations leading up to the making of the contract which the lawsuit was brought to invalidate, and so Yale should not be able to use that lawsuit as an excuse for its own failure to perform; and sixth, that the testimony relating to the Andermanns' development of the Weisbrook property should not have been admitted because it was not material and was prejudicial.

On the other hand the plaintiff maintains, first, that the trial court's finding that the facts showed a joint venture, imposing upon the participants the obligation to act with the utmost good faith, fairness, and honesty toward each other, should not be disturbed because not against the manifest weight of the evidence; second, that the plaintiff, Yale, did not default under the exchange contract, because (a) that contract was executed before the Weisbrook contract and the promissory note and made no mention of default for failure to make timely payment of amounts due under those other instruments, (b) the amount due under the Weisbrook contract was in fact paid in time by the Andermanns, (c) the final payment under the exchange contract was not due until July 1, 1968, (d) it was due at that time only if the Andermanns' deed was ready for delivery, and (e) a deed from them had not by that date been tendered or prepared; third,

that the Andermanns were not in a position to rescind the exchange contract, because sales of lots from Andermann Acres had made it impossible to return the consideration received; fourth, that the Andermanns' letter of January 12, 1968, could not be construed as a notice to retain collateral under the Uniform Commercial Code, and the testimony showed that no such notice was ever sent; fifth, that the Andermanns cooperated with Yale in clearing the title to their property, and the exchange contract called for them to show good title, so they should not now say the cloud on title was not their problem; and, sixth, that the testimony concerning the development of the *Weisbrook* property was properly admitted to show that rescission by the Andermanns had become impossible.

It appears to us that whether the trial court was correct in viewing the relationship of Yale and the Andermanns as a joint venture need not concern us in this appeal. A reviewing court will not consider questions or contentions which are not essential to the determination of the case before it. (*Navickas v. Lawrence Hall, Inc.*, 85 Ill. App. 2d 43, 49 (1967).) We believe the decision of this case turns on factors other than the form the parties' relationship took and the nature of that relationship.

██ Of primary importance in the resolution of this controversy, we believe, is the question whether the plaintiff, Yale, was in default under the exchange contract as is claimed by the defendants. Under that contract Yale was to make its final cash payment on or before July 1, 1968, and each party was to convey to the other when title to both tracts was clear and a deed from the other party was ready for delivery. Such promises, unless a contrary intention clearly appears, are construed to be dependent. (See *Cobb v. Willrett*, 313 Ill. 92, 94 (1924).) Therefore Yale did not have to be ready for a closing until July 1, 1968, or such later time as the title to the Andermanns' property should be clear and their deed should be ready for delivery. It is well established in Illinois that in the absence of a provision to the contrary, the vendor under a contract for the sale of real estate must only have good title at the time when performance by him is required, and if he lacks title earlier, it is sufficient if he acquires title by the time fixed for conveyance. (35 Ill. L. & Pr. *Vendor and Purchaser* §98 (1958).) Until that time arrives, the vendee cannot ordinarily complain that the vendor's title is defective. (Annot., 109 A.L.R. 242 (1937).) The vendor's not having title sooner is not a violation of the contract. (*Monsen v. Stevens*, 56 Ill. 335, 337 (1870).) The same rules apply to a contract for the exchange of real estate. (30 Am. Jur. 2d *Exchange of Property* §16 (1967).) It cannot be claimed that Yale disabled itself from obtaining title to the Weisbrook property by not making the payment due on January 15, 1968, because there had been previous acceptance of late payments and two previous amendments of the Weisbrook contract, suggesting that a third amendment was a possibility, with or without a

change in the price. Furthermore, the Illinois Supreme Court has indicated that even a declaration by the grantor that he is not going to be able to convey as agreed does not constitute a breach of the contract in advance of the time for performance. (*Monsen v. Stevens*, 56 Ill. 335, 336-37 (1870).) We conclude that the trial court was correct in finding that there was not a breach of the exchange contract by Yale.

■■ Since we have determined that Yale was not in default under the exchange contract, we cannot find that the Andermanns properly rescinded that contract for Yale's default. Moreover, the Andermanns, who claim ownership of the Weisbrook property, less parts sold, could not rescind and also retain the consideration received under the contract. (*Jackson v. Anderson*, 355 Ill. 550, 555 (1934).) Furthermore, they could not rescind after they had conveyed a substantial portion of the Weisbrook property to others. *Bell v. Anderson*, 292 Ill. 605, 613 (1920).

We agree with the trial court's finding that the Andermanns did not acquire title to the farm otherwise than pursuant to the exchange contract. The testimony indicates that Yale was not given notice to retain the collateral, under the terms of the assignment contained in the promissory note; the arrangements contained in the letter to Yale dated January 12, 1968, were consistent with continued life for the exchange contract, so that letter was not the equivalent of such a notice; and it does not seem likely that Yale would have sent the Andermanns a quitclaim deed, together with a corporate resolution, if Yale had not considered that the purpose was to carry out the terms of the exchange contract, not to eliminate Yale's ability to convey under that contract.

■■ · It is clear that title to the Andermanns' property, under the terms of the exchange contract, had to be free of objections by the time of the closing of the transaction. However, the pendency of the litigation involving that property rendered the Andermanns' title unmarketable. (*Hayne v. Fenton*, 321 Ill. 442, 447 (1926); *Ableman v. Slader*, 80 Ill. App. 2d 94, 99 (1967).) We agree with the trial court that Yale was entitled to have the cloud on title removed, and could not be in default until that was accomplished.

We agree also with the trial court's ruling that the testimony relating to the development of the Weisbrook property as Andermann Acres was admissible, since it showed the impossibility of restoring the parties to their original position upon a rescission of the exchange contract.

For the reasons stated, the decree of the Circuit Court of Du Page County is affirmed.

All motions taken with the case are denied.

Decree affirmed.

T. J. MORAN, P. J., and RECHENMACHER, J., concur.