RESIDENTIAL REAL ESTATE COMPANY, Plaintiff-Appellant, v. THE ILLINOIS PROPERTY TAX APPEAL BOARD *et al.*, Defendants-Appellees.

Fifth District No. 5—88—0266

Opinion filed September 12, 1989.

Paul H. Lauber, of Farrell & Long, P.C., of Godfrey, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and William H. London, Assistant Attorney General, of Chicago, of counsel), for appellee Property Tax Appeal Board.

Dick Allen, State's Attorney, of Godfrey (Lewis E. Mallott, Assistant State's Attorney, of counsel), for appellee Madison County Board of Review.

JUSTICE LEWIS delivered the opinion of the court:

The plaintiff, Residential Real Estate Co., a corporation, appeals from the judgment of the circuit court affirming a decision of the Property Tax Appeal Board of the State of Illinois (hereafter referred to as PTAB). The cause of action was brought in the circuit court on December 3, 1986, pursuant to the Administrative Review Law (Ill. Rev. Stat. 1985, ch. 110, par. 3—101 *et seq.*). The plaintiff presents two issues for review: (1) whether the amended decision of the PTAB should be reversed because the PTAB failed to apply the burden of proof established by the statute creating the PTAB and (2) whether the amended decision of the PTAB is against the manifest weight of the evidence "where the Board relied on a non-existent,

unsupported presumption, and where said reliance caused it to misjudge the probative impact of all of appellant's evidence."

On the basis of overevaluation the plaintiff appealed to the PTAB of the State of Illinois concerning the assessment of three parcels for the year 1983. The first parcel, parcel No. 14-2-15-11-12-203-31, consisting of about 3.5 acres and improvements, had been assessed a value of $91,160 by the assessor and $71,160 by the Madison County Board of Review; the plaintiff claimed the proper assessment for that parcel was $22,285. The second parcel, parcel No. 14-2-15-11-16-403-026, consisting of about 2.1 acres and improvements, had been assessed a value of $34,070 by both the assessor and the Madison County Board of Review; the plaintiff claimed the proper assessment for that parcel was $8,329. The third parcel, parcel No. 14-2-15-12-13-301-002, consisting of about 1.3 acres of vacant land, had been assessed a value of $11,110 by both the assessor and the Madison County Board of Review; the plaintiff claimed the proper assessment for that parcel was $2,716. The assessment for this parcel was apparently reduced to $1,200 by the assessor after the appeal was filed with the PTAB. The assessment claimed by the plaintiff to be proper for the three parcels totals $33,330.

On March 18, 1986, a hearing was conducted before the PTAB concerning the assessment decision of the Madison County Board of Review. At that hearing only one witness testified, namely, Robert Little, the president of Residential Real Estate Company. He said that he had become president in March of 1983 when a stock redemption agreement had been effected with the previous owners. Prior to that time two brothers, Richard and Norman Stolze, had owned 50% of the company, and three other persons, Evelyn Little, Erma Keller, and Leola Hartman, had owned 50% of it in equal shares. Erma Keller and Evelyn Little are sisters, and Leola Hartman is a "sister-in-law." He described the three women as "cousins or cousins-in-law" of the Stolzes. He stated, "They were all fourth generation and they funneled down from two brothers who were third generations, and there was a resulting fifty/fifty (50/50) split in the stock." This arrangement had been in effect since about 1955. On March 5, 1983, Residential Real Estate Company redeemed all of the shares of Richard and Norman Stolze, leaving the three women as owners of the remaining stock. Residential Real Estate Company paid $50,000 to the Stolze brothers for the stock that was redeemed. The stock redemption agreements between Residential Real Estate Company and each of the two Stolze brothers are included in the record as exhibits.

Residential Real Estate Company was formed "probably in 1961" and owns the real estate parcels in question. Since the formation of Residential Real Estate Company, Illinois Lumber Company, Inc. (hereafter referred to as Illinois Lumber), has leased this property and continues to do so. In May of 1984 Illinois Lumber filed a Chapter 11 petition in bankruptcy and was in Chapter 11 reorganization from May through December of 1984. He said that the lease payments had "started out at about [$28,000] per year" for the purpose of operating a lumberyard, but that in 1983 Illinois Lumber was unable to pay the entire amount because of its lack of funds. He testified that in 1983 Illinois Lumber lost $597,675. In 1984 the amount to be paid for the lease was "[d]own to about [$15,000]" because, he said, "[t]hey still relied on Illinois Lumber's ability to pay and what we felt the property was worth to rent for the sized business we were doing after and during the reorganization." In 1984, he said, Illinois Lumber lost $439,791. Financial statements of Illinois Lumber for the years ending 1983 and 1984 are included in the record as exhibits.

The plaintiff sought reduction of the "assessment," by which he appears to have meant "market value" ($33,330 multiplied by three equals $99,990), to a total of $100,000 for all three parcels taken together, explaining as follows:

> "Well, the first reason is for the purchase price of the building and property. It was set up in the stock redemption, which was a hundred thousand, and at that time Illinois Lumber Company was losing money and they felt that was a fair and equitable assignment of the price to the building and the property."

Asked, "And, when you say 'they felt,' who was that?" the witness answered, "Well, it was between ourselves, as buyers, and Richard and Norman Stolze, as then operating Illinois Lumber Company." Asked how the selling price had been reached, the witness responded, "We felt that was a fair market price for Illinois Lumber Company's building and property. We paid a total price for all of the assets of Illinois Lumber Company and Residential Real Estate, and of that total purchase price, a hundred thousand was a fair and equitable price for Residential Real Estate's building and property." The total purchase price for both the business and the real estate was $500,000; the stock redemption in the amount of $50,000, he indicated, reflected one-half of the value ascribed to the real property. He said, "We estimated a fair market price to both the assets of Illinois Lumber Company and the assets of Residential Real Estate."

The witness stated that "throughout our Chapter 11 reorganization we have attempted to reorganize and get relief in order to continue to operate a business at those premises, and we're asking the same of the Appeals Board in that in order for us to continue in business and further our reorganization we need relief on our taxes."

The hearing officer asked the witness whether he believed that the property "could possibly have been leased to someone else besides people in the family," to which the witness responded, "My opinion at the time was that it could be leased for exactly what it is, and that is a lumberyard and a mill working company." Asked by the hearing officer, "But, it was never put out on the market to see if that property could be used to [sic] anybody else for a higher value?" the witness answered, "No." Asked by the hearing officer, "At the time that you were preparing the information for this hearing a couple of years ago, did you have anybody come in and appraise the property to see what they felt the property was worth?" the witness answered, "No." Asked further by the hearing officer, "Never had anybody come in and physically inspect the property and compare it to other lumber companies?" the witness responded, "No." Asked, "Did you go out and check and see what other similar properties in the area were leasing for?" he answered, "We did not." The property had not been offered for sale.

In his opening statement counsel for the plaintiff described the plaintiff as a "title-holding company" and stated that "the only assets of Residential Real Estate is [sic] the real estate in question. It has no other assets, so it's a company that holds the real estate, it's a stock ownership of real estate value." On plaintiff's assessment complaint form of Madison County Board of Review, Robert Little, as president of Residential Real Estate Company stated in part, under "Reason for Complaint," that "Illinois Lumber Co., Inc.[,] is the sister corporation of Residential Real Estate, Inc."

A member of the Madison County Board of Review, Kerry Miller, appeared on its behalf. In accord with the Board of Review Notes on Appeal (Form PTAB—6), presented to the PTAB by the Madison County Board of Review, he stated that he had examined commercial land sales in the area to see, first, if the land values applied to the property were, in fact, reasonable. The highest and best use of the property is, he said, its current use as a warehouse and for light manufacturing. An analysis of three commercial land sales in the area in 1984 showed prices ranging from $2.39 to $3.57 per square foot; the assessed valuations of two of these sales ranged from $.41 to $.49 per square foot. Two of the plaintiff's three parcels are com-

mercially zoned; the third parcel, which is vacant, is residentially zoned. The two commercially zoned parcels, consisting of 3.5 and 2.1 acres, contain 243,936 feet; the use of a figure of $.40 per square foot yields an assessment of the land in these two parcels of $94,570. The assessed value of these two parcels in 1984 was $33,780. With respect to the third parcel, zoned for residential use, the Madison County Board of Review indicated that if this parcel were put on the market, its use would then be limited to residential use, and its value would, therefore, be decreased. The assessor had erroneously reduced the assessment on this parcel from $11,110 to $1,200 in order to put it in line with other residential lots without realizing its location; the Madison County Board of Review maintained that the original assessment of $11,110 was more nearly in accord with the market. With the use of the assessment of $11,110 for that parcel, the total land assessment should be $108,680 ($97,570 and $11,110). The assessment for the land contained in the three parcels had, in fact, totaled $34,980 ($21,640, $12,140, and $1,200).

With regard to the improvements on the two commercially zoned parcels, the Madison County Board of Review calculated the replacement cost (new) of the buildings together with their depreciation. The improvements on the larger of these two parcels consist of a store/warehouse, three metal polebarns, and two structures with three sides open. These improvements date variously from 1965 to 1972. The reconstruction cost would be $259,507; their current value is considered to be $148,560, which, divided by three, yields an assessed value of $49,520. The current value of $148,560 appears to reflect a reduction for depreciation of 42.75%. The improvements on the smaller of the two parcels consist of a warehouse and a shop area/warehouse, both of which date from 1910. Their reconstruction cost would be $951,902; their current value is considered to be $65,790, which, divided by three, yields an assessed value of $21,930. The current value of $65,790 reflects a reduction for depreciation of about 93.1%. The parties indicate in their briefs that the evidence produced by the Madison County Board of Review pertaining to the buildings on the property was taken from the Illinois Real Property Appraisal Manual. The total assessment for both land and improvements for the larger of the two parcels was $71,160 ($21,640 and $49,520). The total assessment for both land and improvements for the smaller of the two parcels was $34,070 ($12,140 and $21,930). Those two figures, together with the assessment of $1,200 for the third parcel, amounted to a total assessment for the three-parcel complex of $106,430, which, when multiplied by three, indicated a

market value of $319,290.

In an amended decision dated November 7, 1986, the PTAB noted the plaintiff's contention that the purchase of 50% of the stock for $50,000 represented a fair market value of $100,000 for the entire property and found the decision of the Madison County Board of Review to be correct. It found the correct assessed valuation of the three parcels to be as follows: parcel No. 14-2-15-11-12-203-031, $73,680 (land $22,410 and improvements $51,270); parcel No. 14-2-15-11-16-403-026, $35,280 (land $12,570 and improvements $22,710); parcel No. 14-2-15-12-13-301-002, $1,240 (land $1,240 and improvements $-0-). The PTAB found further

> "that the [plaintiff] failed to prove that the fair market value of the subject property was not accurately reflected in its assessed valuation. The only evidence presented by the [plaintiff] was a purchase of 50 percent of the outstanding shares of Residential Real Estate and the financial statements of Illinois Lumber Company. The [plaintiff] failed to establish a fair market value based on the financial data. Illinois Lumber Company is a sister corporation to Residential Real Estate. The sale of the stock was between two shareholders and Residential Real Estate. It is noted that all of the shareholders are related through marriage. This Board finds that the purchase of the stock of Residential Real Estate may not have been an arm's length transaction. The [plaintiff] presented no evidence to establish whether or not this was truly at arm's length. The transaction was between related shareholders. This calls into question the arm's length nature of the sale. The best evidence of value was the cost approach submitted by the board of review. Therefore, this Board finds based on the cost approach submitted by the board of review, that the 1984 assessment is appropriate and no reduction is warranted."

The PTAB noted that Robert Little had requested relief from the PTAB "in order to further reorganization."

Upon review the circuit court in its order entered April 12, 1988, found that the plaintiff is a family-owned corporation, the only asset of which is the real estate in question, which is leased by a sister corporation of the plaintiff, Illinois Lumber. The court noted the plaintiff's contention that the property was worth only $100,000, based upon the sale in 1983, which it described as "between related shareholders. The family relationship was that the buyers and the sellers were first cousins." The court found that the conclusion of the PTAB was not contrary to the manifest weight of the evidence, not-

ing plaintiff's admission that it had no appraisal of the property, plaintiff's lack of evidence as to the value of comparable properties, and plaintiff's failure ever to offer the property for sale or lease to the public on the open market. Finding upon the basis of the entire record that the plaintiff had failed to sustain its burden of proof, the circuit court affirmed the amended decision of the Property Tax Appeal Board, and this appeal followed.

Because of the nature of the issues presented for review, we consider them together. Concerning the first issue the plaintiff contends that the PTAB applied an erroneous standard in judging the evidence. Plaintiff draws this conclusion from the statement of the PTAB in its amended decision that the plaintiff *"failed to prove* that the fair market value of the subject property was not accurately reflected in its assessed valuation." (Emphasis added.) Plaintiff argues that this language shows that the PTAB believed that the findings of the Madison County Board of Review were entitled to a *prima facie* presumption of correctness and that the plaintiff had a burden to overcome. With respect to the second issue raised for review, the plaintiff contends that the PTAB misunderstood and *"totally rejected without consideration"* (emphasis in original) the plaintiff's evidence concerning the stock redemption, "even to the extent of misstating it in its decision." The plaintiff claims that the terms of the detailed agreement between it and the Stolze brothers make clear that the parties had divergent business interests and that the PTAB apparently ignored the two agreements although they were in evidence. Plaintiff avers that it was error for the PTAB to conclude that the parties were "related" in such a way that their transaction should be questioned; there is no evidence, plaintiff says, to support the finding of the PTAB that the arm's-length nature of the stock sale should be called into question. This finding, according to the plaintiff, led the PTAB to reject unjustifiably much of plaintiff's evidence. "By saying that the arm's length nature of the sale was 'called into question,' " plaintiff argues, "the Board in essence relied on a non-existent legal presumption." Plaintiff claims that the PTAB gave no consideration to its evidence of income derived from the property, saying that the PTAB "incorrectly assumed that [plaintiff] was asking for relief from its property taxes because of an *inability to pay taxes.*" (Emphasis in original.) The plaintiff seems to argue that the evidence of the declining income generated by the property indicated its market value and was not considered by the PTAB for that purpose. Plaintiff maintains that the PTAB violated the principles concerning valuation of real property set forth in *Chrysler Corp. v. Illinois Property Tax*

*Appeal Board* (1979), 69 Ill. App. 3d 207, 387 N.E.2d 351, inasmuch as there was before the PTAB evidence of fair market value of the property, namely, the stock redemption agreements between it and the Stolze brothers. For these reasons, plaintiff urges, the decision of the PTAB is against the manifest weight of the evidence, PTAB having "completely failed to give consideration to the evidence presented by Plaintiff in light of the appropriate legal principles."

 The parties state correctly that the PTAB is not to afford *prima facie* weight to the findings and conclusions of fact made by the board of review (*Mead v. Board of Review* (1986), 143 Ill. App. 3d 1088, 494 N.E.2d 171; *Western Illinois Power Cooperative, Inc. v. Property Tax Appeal Board* (1975), 29 Ill. App. 3d 16, 331 N.E.2d 286). The decision of the PTAB must be based upon equity and the weight of evidence. (Ill. Rev. Stat. 1985, ch. 120, par. 592.4; *Commonwealth Edison Co. v. Property Tax Appeal Board* (1984), 102 Ill. 2d 443, 468 N.E.2d 948; *Mead*, 143 Ill. App. 3d 1088, 494 N.E.2d 171.) A taxpayer seeking review in the PTAB from a decision of the board of review does not have the burden of overcoming any presumption that the assessed valuation was correct. (*Mead*, 143 Ill. App. 3d 1088, 494 N.E.2d 171.) Upon judicial review of an administrative decision, the trial court and the appellate court are limited to determining whether findings and orders of the administrative body are contrary to the manifest weight of the evidence and whether the administrative body acted arbitrarily in clear abuse of its discretion, and it is not the function of either of those courts to reweigh the evidence or to assess the credibility of the witnesses. (*Mead*, 143 Ill. App. 3d 1088, 494 N.E.2d 171.) The findings and conclusions of the administrative agency on questions of fact are held to be *prima facie* true and correct. (Ill. Rev. Stat. 1985, ch. 110, par. 3—110; *Commonwealth Edison*, 102 Ill. 2d 443, 468 N.E.2d 948; *Mead*, 143 Ill. App. 3d 1088, 494 N.E.2d 171.) On judicial review of an administrative decision, the appellant has the burden of proving the issues raised in the complaint. (*Mead*, 143 Ill. App. 3d 1088, 494 N.E.2d 171.) It is not the function of either the appellate court or the trial court to substitute its judgment for that of the PTAB but, rather, to insure that an objective, rational decision was reached after a fair hearing at which competent evidence was introduced. (*Mead*, 143 Ill. App. 3d 1088, 494 N.E.2d 171.) A determination by an administrative agency is not to be disturbed upon review unless manifestly against the weight of the evidence (*Mead*, 143 Ill. App. 3d 1088, 494 N.E.2d 171), and, in order to reverse an administrative order, it is required that an opposite conclusion be clearly evident. *La Grange Bank*

*No.1713 v. Du Page County Board of Review* (1979), 79 Ill. App. 3d 474, 398 N.E.2d 992; *People ex rel. Thompson v. Property Tax Appeal Board* (1974), 22 Ill. App. 3d 316, 317 N.E.2d 121, *cert. denied* (1975), 422 U.S. 1002, 45 L. Ed. 2d 666, 95 S. Ct. 2623.

■■ ■ Fair cash value is synonymous with fair market value and is defined as the price a willing buyer would pay a willing seller for the subject property, there being no collusion and neither party being under any compulsion. (*Ellsworth Grain Co. v. Illinois Property Tax Appeal Board* (1988), 172 Ill. App. 3d 552, 526 N.E.2d 885.) A contemporaneous sale between parties dealing at arm's length is not only relevant to the question of fair cash market value but would be practically conclusive on the issue of whether an assessment was at full value. (*People ex rel. Korzen v. Belt Ry. Co.* (1967), 37 Ill. 2d 158, 226 N.E.2d 265.) However, the sale price of property does not necessarily establish its value without further information on the relationship of the buyer and seller and other circumstances (*Ellsworth Grain*, 172 Ill. App. 3d 552, 526 N.E.2d 885). We find instructive the comments made by the court pertaining to arm's-length transactions in *Creme Manufacturing Co. v. United States* (5th Cir. 1974), 492 F.2d 515, 520:

> "If the taxable transaction is at arm's length, the price charged and paid is taken to be an accurate representation of the true worth; that is, the fair market price. But if the transaction is not at arm's length, some other manifestation that the price is nonetheless an accurate portrayal of the article's worth is required. The price must be more than 'fair'; it is not enough that the price compensate the manufacturing company for costs—and even provide a profit. The price must be a 'market' price; it must be the price which independent buyers in arm's length transactions would be willing to pay."

In *Creme*, we note, the court concluded that "[m]ere transfer of stock among the family members [parents and children] did not transform the intercompany sales into arm's length transactions." 492 F.2d at 521.

■■■ There are three basic methods of valuation of real property: (1) the market or comparison approach, which compares the prices actually paid, asked, or offered for similar properties; (2) the income approach, which considers the capitalization of net operating income and is used as a method of valuation when the property is most valuable as rental property; and (3) the cost approach, which considers the value of the land plus the depreciated reproduction cost of any improvements and focuses on what it would cost to recreate

real property with the same value. (See *Lake County Board of Review v. Property Tax Appeal Board* (1988), 172 Ill. App. 3d 851, 527 N.E.2d 84; *Ellsworth Grain,* 172 Ill. App. 3d 552, 526 N.E.2d 885; *Chrysler,* 69 Ill. App. 3d 207, 387 N.E.2d 351.) None of these methods, however, provides conclusive evidence of value but are only factors to be considered. (*Ellsworth Grain,* 172 Ill. App. 3d 552, 526 N.E.2d 885.) Our supreme court has recognized that many factors may prevent a property owner from realizing an income from property that accurately reflects its true earning capacity; however, it is the capacity for earning income, rather than the income actually derived from the property, that reflects "fair cash value" for purposes of taxation. (*Springfield Marine Bank v. Property Tax Appeal Board* (1970), 44 Ill. 2d 428, 256 N.E.2d 334.) In *Consolidation Coal Co. v. Property Tax Appeal Board* (1975), 29 Ill. App. 3d 465, 470, 331 N.E.2d 122, 127, the court stated with regard to the use of the three methods of valuation:

> "Market values generally are the standard to be used in valuing property for tax purposes. It is true that there are instances where no market value can be determined, or where a market value is not truly reflective of an item's worth. In such situations, valuation methods such as 'reproduction cost less depreciation' and 'capitalization of income' are helpful. They are not, however, solely determinative of valuation."

In *Chrysler* the court stated that, in general, reproduction cost should be emphasized only in the context of some special purpose property, which is property of such a nature and applied to such a special use that it cannot have a market value. The court in *Chrysler* held that there was sufficient credible evidence of comparable sales there for the sales to have been given sufficient weight as evidence of market value and concluded that the Property Tax Appeal Board's assignment of a value based solely on a reproduction cost method was incorrect as a matter of law. Following *Chrysler,* in *Willow Hill Grain, Inc. v. Property Tax Appeal Board* (1989), 187 Ill. App. 3d 9, we recently determined that reliance on the replacement cost method of valuation was error where the record was replete with evidence of sales of other facilities similar in various respects to the subject property.

■ In the instant case the principal evidence offered by the plaintiff concerning the market value of the property was that pertaining to the stock redemption of one-half of the stock for $50,000, representing, according to the plaintiff, one-half of the value of the real property. Plaintiff's president testified that the purchase price of

$50,000 for one-half of the real property was "felt" to be "fair" and was "estimated" as a "fair market price" by the cousins and "cousins-in-law" in effecting the stock redemption. He testified that the property had not been offered for sale or lease to anyone outside the family and had not been appraised or inspected for purposes of comparison with similar property. The property is owned by the plaintiff as a family-owned corporation whose function is to hold title to the property, which, since plaintiff's inception, plaintiff has leased only to its "sister corporation," Illinois Lumber, which is, likewise, owned by members of the same family that owns the plaintiff. We have examined the entire record on review. The finding of the PTAB that the purchase of the stock may not have been an arm's-length transaction is entirely in accord with the evidence. Although the plaintiff maintains that the financial data concerning the financial condition of Illinois Lumber was submitted as "further support of the diminished value of the property," it could well have been deemed unpersuasive by the PTAB in that regard, particularly because of the failure of plaintiff to offer the property to anyone outside the family for sale or lease. The plaintiff elected not to put on other, objective evidence to show that the price of $50,000 was an accurate reflection of the market value of one-half of the property, and the PTAB, as trier of fact, could well have found the evidence that was presented by the plaintiff insufficient to show the market value of the property.

Unlike the cases of *Chrysler* and *Willow*, where there was sufficient evidence of comparable sales, in the instant case the only evidence of a sale was what has been described above and could properly have been deemed insufficient by the PTAB. Although the plaintiff adduced evidence of the declining income derived from the lease of the property to its sister corporation, Illinois Lumber, this was evidence of the income actually derived from the property rather than evidence of its capacity for earning income, which, as stated in *Springfield Marine*, reflects fair cash value for purposes of taxation. This evidence is particularly unpersuasive in view of the evidence that the property had never been offered for lease to the general public and that the annual rent had been reduced in accord with the declining fortunes of the lessee family business. Inasmuch as the PTAB could well have concluded that there was, in effect, no reliable evidence under either the market approach or the income approach to valuing the real property, the PTAB properly concluded that the best evidence of the property's value was the cost approach submitted by the Board of Review, and it was not against the manifest weight of the evidence for the PTAB to find, based on the cost ap-

proach so submitted, that the 1984 assessment was appropriate and that no reduction was warranted.

●11 Given the insufficiency of the evidence adduced by the plaintiff, we conclude that there is no merit to the plaintiff's contention that the PTAB applied an erroneous standard in judging the evidence and improperly accorded a *prima facie* presumption of correctness to the findings of the Madison County Board of Review to be overcome by the plaintiff.

Affirmed.

WELCH, P.J., and CHAPMAN, J., concur.